Matter of Autumn A. (Cherrie A.) (2024 NY Slip Op 51769(U))

[*1]

Matter of Autumn A. (Cherrie A.)

2024 NY Slip Op 51769(U)

Decided on December 23, 2024

Family Court, Kings County

Deane, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 23, 2024
Family Court, Kings County

In the Matter of an Article 10 Neglect Proceeding 
 Autumn A. and Other Children Under Eighteen Years of Age Alleged to be Neglected by Cherrie A., Respondent.

Docket No. NN-XXXXX-XX/24

Administration for Children's Services (Chelsea Donohue, Esq. of Counsel) for Petitioner.
Vivienne Hewitt, Esq., Attorney for the Respondent Mother, Ms. A.
Vincent Phillips, Esq., Attorney for the Subject Child Autumn A. 
Mindy Gress, Esq., Attorney for the Subject Children Tyrell A., Jamie A., Damien A., Noah A., Riley A., Mason A. and Logan A.

Jacqueline B. Deane, J.

Introduction
On November 18, 2024, the Respondent mother, Cherrie A. ("Respondent"), filed a motion to dismiss the neglect petitions against her, pursuant to Family Court Act § 1051(c) on the grounds that the aid of the court was no longer required given the fact that she has safely cared for her 8 children since the filing of this neglect case 7 months ago and in light of the extreme negative impact that this case and ACS/Court involvement has had on the family. The motion is strongly supported not only by the Attorney for the Children ("AFC") for the 7 children who are not the alleged target child but also by the AFC for that child, Autumn. Petitioner Administration for Children's Services ("ACS") filed papers in opposition to the motion.
As mentioned, this is a family of EIGHT children. The oldest child is Tyrell, age 14 at the time of filing; next is Jamie, then age 12, Damien, age 10, Autumn, age 8, Noah, age 7, [*2]Riley, age 4, and the twins Mason and Logan, age 1 and a half.

 Procedural History
On May 13, 2024, the Petitioner ACS filed these neglect petitions against the Respondent mother, Ms. A., alleging that the Respondent neglected the subject children due to her use of excessive corporal punishment, primarily due to an incident where she threw a roll of tape and sneaker at the child Autumn on April 29, 2024; Autumn was hit by the tape and the sharp edge cut her lip. This cut was observed at school and the school officials called in a report to the State Central Registry that day. The petition also alleges that the Respondent mother has hit Autumn and the other children in the past, including with a stick, although no other marks or bruises are alleged to have been seen on any of the children besides the scratch on Autumn's lip. There is also an allegation that the Respondent mother failed to sign a form for the school to engage Autumn in counseling. See Neglect Petition.
At filing, ACS consented to the 8 subject children, including the target child Autumn, remaining in the family home with their mother. After the two AFCs spoke to their respective clients, they also supported this order stating that ALL of their clients wanted to remain together and home with their mother. None of the other 7 children raised any safety concerns about their mother's care of them. The 8 subject children have remained in the home with their mother without any incident or safety concern being raised for the 7 months since.
Initially, ACS was willing and sought to work with Ms. A. without filing a petition or coming to court at all. A Child Safety Conference was held on May 3, 2024, and ACS recommended a service plan of preventive services in the home and therapy for the Respondent mother as well as for the child Autumn. See Affirmation in Opposition submitted by Petitioner, at p. 2, para 6. ACS points to the mother's refusal to agree to preventive services when they came to her home 5 days later as the reason the petition was filed. Id. at para 7. Ms. A. states she was not unwilling to accept the services but was reluctant to agree to sign away her child support earnings which was a component of the consent. See Affidavit of Respondent Mother, dated Nov. 17, 2024, para 14 and "Consent for Service" Form signed May 8, 2024 attached as Exhibit D to Respondent's Motion. Ms. A. was also arrested for the incident with Autumn, and, as a result, faced the added stress and collateral consequences of having criminal charges pending along with this neglect matter. Those charges were later allowed to be dismissed by the District Attorney's office and that case was sealed on October 25, 2024. See Exhibit I attached to the Respondent's motion.

 Legal Analysis
Respondent's motion seeks dismissal pursuant to FCA § 1051(c) in that no further aid of the Court is required. FCA § 1051 relates generally to various circumstances where courts may sustain or dismiss an Article 10 petition. Section 1051(c) sets forth two legal bases for dismissal of a petition: (1) "if facts sufficient to sustain the petition are not established" or (2) "if, in a case of alleged neglect, the court concludes that its aid is not required on the record before it." Under either circumstance, the court "shall dismiss the petition and shall state on the record the grounds for dismissal." FCA § 1051(c). The plain language of the statute implies that the "aid of the court" prong may be granted in any neglect case prior to a fact-finding order as long as there is sufficient basis for the court's conclusion "on the record before it." That record could include the court file, prior court appearances on the case, and the affidavits and exhibits attached to a [*3]motion. The statutory language further supports this interpretation by referring to cases of "alleged neglect", indicating that such a motion is not available once an adjudication has occurred. The plain language also establishes that the existence of neglect is not a bar to dismissal under this second prong. Given this statutory language, the legislature clearly intended §1051(c) to preserve the rehabilitative purpose of Article 10 by acknowledging that, even where a parent may have fallen short in the care of their children in a way which constitutes neglect under the law, the parent may have sufficiently learned from this error in judgment prior to the fact-finding hearing to the extent that further involvement of the court and the child welfare system is unnecessary.
It is significant to note that the heading of FCA § 1051 is "sustaining or dismissing a petition" rather than "orders after fact-finding hearing." Similarly, 1051(c) refers to the "record before" the Court, not the record at the fact-finding or any other type of hearing or the evidence submitted at a hearing. In fact, at no point in the body of the section do the words "fact-finding" or "hearing" appear. If the Legislature had intended this relief to be limited to after a hearing, it would have been logical to include that language.[FN1]
Petitioner does not appear to be taking the position that the Court cannot, legally, dismiss a petition without a hearing on the second prong of 1051(c) as ACS acknowledges that the language of the statute is that a sufficient "record" is required. Petitioner then cites cases in its opposition to the motion where courts have found a fact-finding hearing was found by those courts to be necessary for the determination as to whether its aid was needed. See Affirmation in Opposition p. 6, paragraph 26-27, dated December 3, 2024. The fact that, in other instances, courts found that a hearing was needed to ascertain whether the court's aid was needed does not mean that it is required in every case, or in this case specifically. This Court and others have held that, as long as the record, in whatever form, established that "no further legitimate purpose would be served by continuing ACS's [*4]involvement" with the instant Respondent, the case should be dismissed pursuant to FCA § 1051(c).[FN2]
See In re Kailynn I., 52 Misc 3d 740 (Fam. Ct. Kings County 2016).
Support for the proposition that a fact-finding hearing is not the only way a record sufficient for dismissal under the 2nd prong of § 1051(c) can be established is found, as well, in Matter of Angel R., 285 AD2d 407 [1st Dept 2001]. In that case, the Family Court dismissed a neglect case because of the petitioner's lack of readiness to proceed at the fact-finding. While the First Department did not condone the dismissal on this basis, it did find dismissal to be proper because the court's aid was not required given that the two older children were living in Puerto Rico with their grandmother and the youngest child was already under the petitioner's supervision. Thus, the record below was found sufficient to establish the second prong of § 1051(c) even without a fact-finding hearing.

The Record Before the Court
The record before the Court in this case includes: Ms. A.'s 10 page sworn affidavit and the 12 exhibits attached to support the Respondent's Motion to Dismiss, the 6 exhibits attached [*5]to the Petitioner's Opposition to the motion, and 3 ACS reports submitted over the course of these proceedings, on September 11, 2024, October 23, 2024 and November 18, 2024. Ms. A.'s exhibits include: the consent she signed for preventive services dated May 8, 2024, the certificate of dismissal of her criminal case, school attendance records for the 5 school age children, the syllabus from her course in maternal and child nursing, and proof of lost employment. Petitioner's exhibits include the ORT dated April 29, 2024, 5 pages of ACS Investigation Progress Notes which include a summary of the Child Safety Conference ("CSC") held on May 3, 2024, the Initial CSC Recommendation Summary, the Neglect petition, the Order of the Court releasing the children to their mother dated May 17, 2024, and 17 pages of Family Service Progress Notes from July 25-30, 2024.
The records establish that a Child Safety Conference ("CSC") was held on May 3, 2024, and Ms. A. admitted that she threw a roll of packing tape at Autumn because Autumn threw it at her first. Ms. A. denied using force to throw it at her daughter, which was confirmed by the maternal grandmother who was present during the argument. Ms. A. stated that the only form of physical punishment she uses is "open handedly hitting the children on fatty areas of their bodies" and "denied utilizing any objects as a form of punishment." Ms. A. reported that since her most recent case where ACS provided her with services in the home, she had learned to use her support system to insure the children always have appropriate adult supervision. Both the mother and grandmother also expressed that they are concerned with Autumn's behavior, that she often lies and misbehaves at school and home and that Ms. A. has requested that the school evaluate Autumn to enable her to obtain counseling services. See Exhibit 2, Investigation Progress Notes, attached to Petitioner's Affirmation in Opposition, at p. 37. Ms. A. also acknowledged hitting the two oldest boys with a stick in the past but that since she was told by ACS that she should not use the stick as a form of discipline, she has not done so and has only used it as a "scare tactic." See Exhibit 3, Initial CSC Recommendation Summary, attached to Petitioner's Affirmation in Opposition, at p. 2. ACS recommended a service plan of preventive services in the home and therapy for the Respondent mother as well as for the child Autumn. See Affirmation in Opposition submitted by Petitioner, at p. 2, para 6.
Over the next several months there were significant delays in meaningful services being provided to the family which the Court references later in this decision. In short, these delays are attributable to both ACS and to a lesser extent to Ms. A. ACS bears greater responsibility given that it is a large government agency tasked with the duty to provide parents and families with assistance when it determines that such intervention is necessary to insure children are safe at home whereas Ms. A is a single parent working hard to care for 8 children.
By the time of the November 28th court report, these services had been put in place. The report states that the child Autumn was enrolled in both in-school and outpatient therapy and that Ms. A. was engaging with preventive services which would implement anger management and parenting skills. The preventive worker had "no pressing concerns." The day care provider for the youngest children also had no concerns for the case of the children and said Ms. A. was a "good mother" and if anything was "too lenient." See ACS Court Report, dated November 28, 2024, p. 3-5, attached as Exhibit H to Respondent's Motion. At a home visit on November 13th, the caseworker observed all of the children to "have a close bond with each other and their mother" and added, "The older children are not parentified but willingly assist the mother in caring for the younger children by consoling them and providing them with toys or food at their request." Id. at p. 2.
The record also includes this Court's experience presiding over 8 court conferences from May through November at which Ms. A. consistently appeared and engaged pro-actively.

 DECISION
The issue here is whether the Family Court finds that the "record before it" on this specific case is sufficient to reach the conclusion that its aid is not required.
The impact of these dual court proceedings was particularly severe on Ms. A. and her children as she is a licensed practical nurse who was the sole support for the family. Ms. A. lost her job as a result of these cases at some point after the filing and she has had to apply for public assistance. See Affidavit of Respondent Mother, dated Nov. 17, 2024, para 24-25. This has caused this large family extreme financial hardship which has caused tremendous stress and harm to the children. Ms. A. could no longer afford her car which she used to drive all of the children to school and day care, including her oldest who is in a competitive high school that now takes him over 2 hours of travel each way. She has been unable to afford internet which the children need for school as well as pay bills for the child Autumn's therapy and the children's dental care and eyeglasses. Id. at para. 26-29.
Here, Ms. A. did acknowledge throwing the tape at Autumn and also having used other forms of physical punishment in the past. In contrast, In re Phillips N., 104 AD3d 690, 692 [2d Dept 2013] (dismissal under § 1051(c) properly denied where the mother never admitted responsibility for her daughter's injuries). The ACS case records contain Ms. A.'s statements that, after she was told by ACS in the past that she could not use a stick as a form of discipline, she has not done so. See Affirmation in Opposition submitted by Petitioner, attached as Ex. 3, Child Safety Conference Notes at p. 2.
Additionally, the Court does not believe that any additional services or ACS intervention is needed to insure the children's care reaches the minimum legal standard. In the Second Department's decision in In re Kayden H., 104 AD3d 764, 764 [2d Dept 2013], the Appellate Division found that, "although facts sufficient to sustain the petition were established," the Family Court should have dismissed the petition pursuant to FCA § 1051(c) because the mother and grandmother had completed all of the services ACS had requested of them, the child was returned to the mother during the course of the proceeding, and the ACS progress notes noted "no safety concerns." Id. at 765-66. The Second Department concluded that what was important in that case was "that the incident on which the petition was based was an isolated one, that the mother and grandmother had been rehabilitated, and that the child was no longer at risk of being neglected." Id. at 766.
Based on the Court's knowledge of this case and the papers filed, there have been two issues that have kept this case from resolving sooner with a withdrawal or an Adjournment in Contemplation of Dismissal ("ACD"), which would be the appropriate outcome given that ACS was initially looking to avoid court for this family entirely. First, after filing, ACS wanted Ms. A. to engage in preventive services as well as parenting and anger management. This was unrealistic given that she was still parenting all 8 children in her home. Rather, ACS should have proactively offered from the outset to discuss having the assigned preventive agency include these services within their home-based approach, rather than waiting until October to "encourage the respondent mother to speak with the preventive agency about incorporating these services." See Affirmation in Opposition submitted by Petitioner, at p. 5, para 19. This is particularly true given that Ms. A. had previously completed this class and repeating it would not address the [*6]specific scenario here of managing 8 children of various ages which requires the kind of individualized parenting strategies a preventive worker could provide. The second issue was Ms. A. concerns about signing the necessary paperwork for preventive which included an assignment of child support. Once Ms. A. was assigned an attorney, this issue could have been quickly addressed, and potentially resolved, between counsel. Instead, it took months for these two issues to be successfully addressed. Additionally, both the mother and grandmother expressed concerns and challenges with the child Autumn's behavior generally which could have provided an opportunity for ACS to offer empathy and support. Finally, there was no opportunity for any assigned workers to attempt to forge a more positive working relationship with Ms. A. given that, over the course of this case, ACS had 10 different ACS case workers come to the home as well as 5 different preventive workers, making the formation of a trusting relationship near impossible. See Affidavit of Respondent Mother at para 17-19.
It is often the case that the parents who come before the Family Court are mistrustful and/or resistant to ACS caseworkers and services. This is not at all surprising. This is the same agency that entered the sanctity of a family home for the purpose of investigating allegations of inadequate parenting. No parent welcomes this type of intrusion and examination nor the anxiety for the entire family that that it brings. While this is the very essence of ACS's job and, necessary for ACS to fulfill its important function of ensuring that children's care in a home does not fall below the minimum legal standard, the impact on, and reaction of families is also predictable and understandable. In addition, for many complex reasons, the families investigated by ACS in New York City are overwhelmingly from lower income communities of color who have experienced a high level of surveillance and bureaucratic over-sight simply due to where they live, attend school, and their financial situation. The stress these families already feel is an important back-drop to the reaction of these parents when confronted by an ACS investigation.[FN3]

ACS's opposition to this motion is largely based on Ms. A.'s failure to complete her service plan. However, the reality is that ACS did not engage meaningfully with Ms. A. to address and/or overcome her concerns and accomplish this goal by working collaboratively with her. While Ms. A. may not have engaged in all the services ACS would have wanted her to, the reality is that the children have been home safely for 7 months and there is no basis to believe that additional services, particularly ones Ms. A. has previously completed, would make a difference in the future. It is inevitable that every parent "loses their cool" at times and does not respond to stress in an ideal way. No parent is perfect, and perfection is not the goal of the child welfare system; rather it is intended only for those situations where the manner of response falls below a minimum standard.
While there has not been a trial here, based on the ACS case records cited in the various [*7]motion papers, this Court would likely not find the "punishment" used here to be "excessive" under the law. A parent's reaction of throwing a benign object like tape, that was not inherently dangerous, out of frustration where it was first thrown at them by the child, resulting in an accidental minor injury, on one occasion is not enough for a finding of neglect. The maternal grandmother, who was present, specifically told ACS at the pre-filing conference that the tape was not thrown with force. See Affirmation in Opposition submitted by Petitioner, attached as Ex. 2, ACS Progress Notes at p. 37. While Ms. A. acknowledged she had used a stick in the past on some of the other children, she stated that she had stopped after a prior ACS involvement taught her that was inappropriate. There is also no evidence of marks on any of the other children and none of them expressed any current recent physical punishment or other concern about remaining with their mother.
It is important to note that Article 10 does not prevent all physical punishment — only excessive. See FCA §1012(f)(i)(B). As the Second Department held in Matter of Anastasia L-D., "[p]arents have a right to use reasonable physical force against a child in order to maintain discipline or promote the child's welfare. Although a single incident of excessive corporal punishment may suffice to support a finding of neglect, there are instances where the record will not support such a finding, even where the parent's use of physical force was inappropriate." 113 AD3d 685, 686 [2d Dept 2014] (father hit 14-year-old with a belt causing bruises because she had cut school and was refusing to give him her cell phone); In re Christian O., 51 AD3d 402, 403 [1st Dept 2008] ("This appears to have been an isolated incident, and '[w]hile losing one's temper does not excuse striking and injuring one's child, one such event does not necessarily establish ... neglect'"] (quoting Matter of P. Children, 272 AD2d 211, 212 [2000], lv. denied 95 NY2d 770 [2000] ); Matter of Hattie G., 48 AD3d 1292 [4th Dept. 2008] (no neglect where mother, after discovering that fourteen-year-old daughter stayed out overnight without permission, confronted her with plastic toy wiffle bat, struck her several times in legs and buttocks, and then accidentally struck her once in head and caused a small welt or bruise under right eye); Matter of John O., 42 AD3d 687 [3rd Dept. 2007] (no neglect where respondent hit child on hand with wax candle causing bruising); Matter of Jerrica J., 2 AD3d 1161 (3rd Dept. 2003) (no neglect where respondent put up her hand and foot and accidentally made contact with child in self-defense when child slapped her, and punched child in arm during argument while driving); Matter of Amanda E, 279 AD2d 917 [3d Dept 2001] ("Given the [subject child's] age, the circumstances under which the altercation occurred and the isolated nature of the father's admittedly inappropriate conduct, we cannot say that Family Court erred in dismissing the subject petitions").
Based on what this Court's has come to learn of Ms. A. and her commitment to thoughtful parenting which she sets forth in her affidavit, the Court credits that she is aware that physical punishment is not a preferred option for discipline, nor is it Ms. A.'s primary strategy. Rather, she sets forth how she often allows the children to choose their consequence which most often involves loss of electronic privileges. See Affidavit of the Respondent, para 21. This Court also believes that Ms. A. will take every step possible to avoid the use of physical punishment in the future even without any additional service engagement, given the level of stress and financial hardship that her use of physical punishment resulted in over the past 8 months.
Moreover, as previously noted, both Attorneys for the Children, the attorney for Autumn the alleged focus of the petition and the attorney for the 7 other children, support dismissal as the children have not expressed any fear of their mother and have expressed significant upset at the [*8]impact of ACS involvement here. See Affirmations in Support of the Respondent's motion by AFC Phillips dated December 2, 2024 and AFC Gress dated May 21, 2024. The Court believes that the delay and stress of a trial and prolonged ACS involvement is contrary to these children's best interests and is not needed for their safety.
Therefore, upon this Court's careful review of the record, the Respondent mother's motion to dismiss pursuant to FCA § 1051(c) is granted as this Court finds that no further legitimate purpose underlying Article 10 would be served by continuing ACS's petitions against Ms. A. and the Court's aid is not required.
WHEREFORE, the petition against Ms. A. is dismissed with prejudice. Notify parties.
Dated: December 23, 2024
New York
ENTER:
Hon. Jacqueline B. Deane, J.F.C.

Footnotes

Footnote 1:Although not cited by petitioner here, this Court has, in prior decisions on this issue, taken note of the Second Department's decision In re Jonathan M., 306 AD2d 413, 414 [2d Dept 2003]. This decision contains language that "only at the conclusion of a fact-finding hearing can the Family Court dismiss the petitions upon a determination that its aid is not required on the record before it." However, this language appears only to be dicta, given the specific facts before the Appellate Division. In Jonathan M., "rather than holding a fact-finding hearing, the Family Court dismissed the petitions stating that sufficient facts had not been established to sustain the petitions" (emphasis added). Thus, the lower court's decision was actually based on the first prong of § 1051(c), sufficiency of the evidence, and a fact-finding hearing was clearly required. This Court does not believe the Second Department intended Jonathan M. to prevent a dismissal on the second prong of § 1051(c) where "the record" required by the statute does exist prior to a fact-finding hearing AND it establishes that the aid of the court is not required. Such an interpretation would result in this Court having to conduct an unnecessary fact-finding hearing to reach the same conclusion, thus needlessly spending the parties' and this court's limited time and extending ACS's intrusion when it is not serving any useful purpose to this family. The Court has also considered but found little guidance in the case In re Chandler D., 16 AD3d 684, 684 [2d Dept 2005], as the Appellate Division gives no case facts or specific information as to why it found error where the Family Court dismissed a neglect petition under § 1051(c) without a fact finding hearing.

Footnote 2:As this Court noted in Kailynn I., many of the appellate cases in which § 1051(c) is cited, and in which dismissals have been reversed, involve appeals of the Family Court's dismissals of cases based on the behavior of ACS in their presentment of the petition at fact-finding. See In re Jasmine S., 1 AD3d 257, 259 [1st Dept 2003] (finding error in Family Court's mid-fact finding dismissal due to various delays by petitioner since failure to prosecute was not willful); Matter of Melissa B., 225 AD2d 452, 452-53 [1st Dept 1996] (dismissal of neglect petition found to be "far too harsh a remedy for the negligible lateness of petitioner's counsel"); Matter of Rhonda T., 99 AD2d 758, 758-59 [2d Dept 1984] (dismissal as sanction for improper behavior of ACS reversed). These dismissals were reversed because there was no indication that FCA § 1051(c) was intended to be used as a sanction against the petitioning agency.

There are also a number of appellate cases reversing Family Court dismissals under the first prong of § 1051(c) where the Family Court found that "facts sufficient to sustain the petition under this article were not established" without allowing for a full fact-finding hearing or other record to be developed by ACS. See In re Jayann B., 85 AD3d 911, 912 [2d Dept 2011] (allegations were sufficient to require a fact finding hearing to be held); In re Latanya C., 37 AD3d 716 [2d Dept 2007] (dismissal mid-fact finding due to delays and Court's determination that witness was not credible was premature); Dutchess County Dept. of Social Services on Behalf of John S. v Peter B., 224 AD2d 617 [2d Dept 1996] (dismissal based on Court's determination that there was no future risk of sex abuse was improper without a fact finding hearing); Matter of Commr. of Social Services on Behalf of Clara deJ., 186 AD2d 33, 34 [1st Dept 1992] (dismissal for failure to state a cause of action reversed; finding of neglect was possible so fact finding should have been held); Matter of Emanual David R., 119 AD2d 677, 677 [2d Dept 1986] (dismissal for failure to make out a prima facie case reversed because petitioner had not yet rested). These cases are all clearly distinguishable from the instant case in that the lower courts precipitously dismissed the cases based on insufficient proof that could ultimately have been established had the fact-finding hearings been allowed to proceed to completion.

Footnote 3:These observations are ones I have made as a Judge who has presided for the past 10 years in Kings County Family Court, which is an incredibly high-volume courthouse. I provide these neither as a criticism of ACS or an excuse for parents who decline potentially helpful services, but to describe what I have come to appreciate as the extremely difficult task of the child welfare system. Overcoming this inherent conflict and tension in ACS's two legal mandates of being the same agency that enters a family's life as an investigator and prosecutor and then attempts to forge a supporting working relationship with that same parent is perhaps the most challenging task of the child welfare system.